(105 'So. 24)

No. 25047.

**EDENBORN v. AVOYELLES CYPRESS CO., Ltd.**

(May 25, 1925.  Rehearing Denied June 22, 1925.)

*(Syllabus by Editorial Staff.)*

1. **Logs and logging** ⬳3(10)—**Contract for sale of timber, requiring defendant to cut all parts of trees that would make lumber, from highest grade down to and including merchantable pecky, construed.**

Under contract for sale of timber, requiring defendant to cut all parts of trees that would make lumber, from highest grade down to and including merchantable pecky, defendant had alternative of manufacturing for grade, thereby increasing amount of high grade lumber commanding higher price, or to saw timber to get greatest amount of lumber of all grades, and was not required to saw timber so as to yield greatest amount of lumber without reference to grade.

2. **Logs and logging** ⬳3(15)—**Evidence held insufficient to justify finding of fraud in contract for sale of timber.**

Evidence *held* insufficient to justify finding that defendant, either deliberately and fraudulently wasted and destroyed, or failed and neglected, under terms of contract for sale of timber, to manufacture into lumber cypress timber in amount nearly equal to amount which was manufactured, and gum timber in double that amount which was made into lumber.

Appeal from Civil District Court, Parish of Orleans; Wynne G. Rogers, Judge.

Suit for injunction by William Edenborn against the Avoyelles Cypress Company, Limited.  Decree for defendant, and plaintiff appeals.  Affirmed.

Milling, Godchaux, Saal & Milling, of New Orleans, and Wise, Randolph, Rendall & Freyer, of Shreveport, for appellant.

Dufour, Goldberg & Kammer, of New Orleans, and Borah, Himel, Bloch & Borah, of Franklin, for appellee.

THOMPSON, J.  This suit as originally instituted was to annul a written contract by the terms of which the defendant purchased from the plaintiff certain timber, to be manufactured by the defendant into lumber and shingles, at a fixed price per thousand feet board measure.  The suit also included a demand for approximately $15,000 as damages for destruction and waste of timber in the method and manner of cutting the timber and sawing it into lumber and shingles, in alleged violation of the terms of the contract.

An injunction was prayed for restraining the defendant from proceeding further with the execution of the contract, but the writ appears not to have been issued, or, if issued, was not enforced, and the defendant was permitted to go ahead cutting and sawing the timber.

The contract was entered into on February 7, 1912, and milling operations were to begin on or before July 1 of that year.  The timber was to be cut and manufactured within four years from the date of the commencement of operations.

The sawing did not actually begin until the early spring of 1913, but was completed, and all the timber was cut and sawed by January 9, 1915.

Shortly after the timber was all cut, the plaintiff filed an amended petition in which it was alleged that since the filing of the original petition the waste in lumber and shingles and the destruction of the timber had continued, resulting in a damage and loss to the plaintiff in an amount approximating $135,000.

The contract having been fully executed, the demand for its nullity was thereby eliminated as an issue, and the action was resolved into one for damages pure and simple.

The position of the plaintiff may be more clearly stated by quoting paragraph 9 of the amended petition:

"Your petitioner now believes, from the best information obtained, and, believing, avers that the total amount of waste, either in errors or

mistakes, or otherwise failing to report the total amount of timber cut, together with the waste and destruction of the lumber in sending it to the slasher and burning it at the mill, and leaving vast quantities of timber in the woods, aggregates at least 15,000,000 feet of cypress timber, which under the contract price would be worth to your petitioner at least $9 per thousand feet, or a total of $135,000."

In further amplification of the cause of action, it is alleged that, prior to the contract with the defendant, petitioner bought the timber, and before he bought he had the same estimated by a timber estimator, who estimated that there were 36,000,000 feet of cypress timber standing upon the land, all of which was embraced in the sale to defendant, that there were other reliable estimates which showed that there were something like 28,-000,000 feet of cypress timber standing upon the land, and that plaintiff could have actually sold the land to a person who made an examination and estimate thereon, with a view of buying the same, at 30,000,000 feet.

The pertinent provisions of the contract involved are as follows:

"The said Edenborn herein sells to the said company, and the said company agrees to take, cut, and pay for all the cypress and gum on the brake of a diameter of ten inches and over at the small end of sixteen-foot logs for cypress, and of a diameter of twelve inches and over at the small end of sixteen-foot logs for gum, and to cut all parts of trees that will make lumber from the highest grade down to and including merchantable pecky, and make cypress shingles and laths out of the waste production of the remainder of cypress to the fullest possible extent.

"Ten thousand shingles shall be counted and paid for as one thousand feet of lumber. No lath shall be manufactured except out of timber unfit for lumber or shingles."

It was agreed that the Cypress Company would cut the entire cypress and gum of the dimensions stated within four years from July 1, 1912, and, in the event of failure to do so, to pay Edenborn for all timber uncut and unmanufactured at the end of said period at the rate of $12 per thousand feet, lumber scale in the tree, for all such cypress, and $3 per thousand lumber scale for gum timber left remaining at that date, to be estimated by a reputable estimator selected by Edenborn.

The contract provided the following scale of prices for timber manufactured into lumber and shingles: $8.50 per thousand feet board measure for all cypress lumber and shingles cut and sawed during the first year; $9 per thousand feet during the second year; $9.50 per thousand feet for the third year; and $10 per thousand feet for the fourth year.

The gum was to be paid for at the rate of $1 per thousand feet for the first year, and an additional 5 cents per thousand feet for each of the three succeeding years.

The company agreed to keep a book, journal, or stock sheet, to be made up every day when the mill was running, showing the full amount of all lumber and shingles made that day, and to mail copy to the plaintiff. It was also provided that a statement of the aggregate cut at the close of each month should be made and sent to the plaintiff, and payments to be made on the 10th of each month for all timber cut and manufactured in the preceding month.

The agreement provided that Edenborn should have the right to keep a man at the mill, and near enough to the saw so that he could measure and tally the lumber and shingles as sawed, and the right was granted Edenborn at any time to examine all the books and records of the Cypress Company for the purpose of ascertaining the amount of lumber and shingles produced.

As already noted, the actual operations of the mill began in the early part of 1913. About two months thereafter the plaintiff placed one F. B. Kelley at the mill to look after his interest in accordance with the terms of the contract.

It was not long before Kelley began making complaints and reported to Edenborn

that the terms of the contract were not being complied with by the defendant, that the timber was not being manufactured so as to get the greatest amount of lumber therefrom, and that a great deal of the low grade lumber was being sent to the burner.

Acting on the faith of the reports made by Kelley, Edenborn took the matter up with the defendant, and quite a bit of correspondence passed between them; the sum and substance of which amounted to a contention on the part of Edenborn that the defendant company was actively violating the expressed terms of the contract to the great injury and loss to the plaintiff, in manufacturing the timber so as to get the greatest amount of high grade lumber, and thereby wasting and destroying much of the lower grades.

The defendant disagreed with the interpretation placed by the plaintiff on the contract, and took the position that the contract was not being violated as charged; that the defendant had the legal right to saw the timber so as to get the greatest amount of high grade lumber, which necessarily reduced the output of the lower grades.

The defendant had agreed to pay the same price per thousand feet for all grades, and it is shown that during the time of the operations of the mill the price of the lower grades was such that the lower grades could not be manufactured at a profit for the price defendant had agreed to pay.

Manifestly it was to the interest of the defendant to get all the high grade lumber possible, and this very naturally operated to the injury of the plaintiff.

We are not convinced from the evidence, however, that the method pursued by the defendant in manufacturing, so as to get the greatest amount of the higher grade lumber, was adopted for the purpose of reducing the quantity of the lower grades, and thereby to relieve the defendant from paying to that extent for the lower grades, as charged by the plaintiff. On the contrary, we are satisfied that the defendant acted in good faith in operating to its best advantage.

[1] The cutting for grade necessarily reduced the output of the lower grades to the disadvantage of the plaintiff, but this we think the defendant had the right to do under a proper interpretation of the contract. The defendant clearly had the alternative of manufacturing for grade, and of thus increasing the amount of high grade lumber commanding a higher price, or to saw the timber so as to get the greatest amount of lumber of all grades. The first alternative operated to the defendant's advantage. The second would have been advantageous to the plaintiff and a great loss to the defendant. The defendant was justified in the method pursued.

The requirement of the contract was that defendant should cut all parts of trees that would make all grades of lumber from the highest grade down to and including merchantable pecky. In other words, we take it that no timber was to be left that could be manufactured into lumber of any grade from the highest down to what is known as marketable pecky. The language appears to us to be free from doubt, and is not subject to the construction attempted to be placed on it by the plaintiff, which would require that the timber be so sawed as to yield the greatest amount of lumber without reference to grade. The words "to the fullest possible extent" refer to the making of cypress shingles and laths out of the waste production of the remainder that could not be made into lumber.

The method pursued by the defendant, we understand, is the usual and customary method employed in manufacturing timber into lumber.

A statement made by plaintiff's representative, Kelley, filed in evidence, beginning with the month of December, 1913, and ending on January 9, 1915, purports to show a waste and destruction of timber by the de-

fendant aggregating 3,025,858 feet of cypress and 222,272 feet of gum, which plaintiff claims should have been made into lumber and shingles. The amount practically equals 20 per cent. of the entire amount of cypress lumber reputed as having been sawed and paid for by the defendant.

The report of Kelley is supported only by his testimony, which is too uncertain and indefinite to justify any sort of judgment against the defendant. It is inconceivable that the defendant, in order to avoid paying for the lumber, should have sent to the burner or otherwise destroyed such a large amount of timber.

The contention in plain English amounts to a charge of deliberate and intentional fraud perpetrated by the defendant against the plaintiff. The trial judge, who saw and heard the witness Kelley, was not favorably impressed with his testimony, and, after reading the same in the light of all other testimony and circumstances of the case, we are not in a position to disagree with the conviction of the trial judge, who got his impression at first hand.

Nor was the trial judge inclined to credit the testimony of some of the other witnesses who testified as to deliberate and willful acts of waste and destruction of lumber by the defendant in its method of manufacturing the same. We have carefully read this testimony, and it is clearly insufficient to justify us in awarding the plaintiff a judgment in any sum on the score of intentional waste and destruction of timber that would make either marketable lumber or shingles.

It may be proper to observe in this connection that the plaintiff, in the ultimate analysis of the action, does not rely so much on the report of wastage as made by Kelley, as the measure of the defendant's liability. By the amended petition, the amount of wastage shown by Kelley's report was merged into the larger claim, which represents the difference between the amount of timber which plaintiff claims should have been manufactured from the cypress brake and the actual amount reported and paid for by defendant.

It is claimed in defendant's brief that there were 29,543,825 feet of cypress which should have been made into lumber, whereas the defendant accounted for only 15,433,978; that there were 16,803,068 feet of gum which should have been sawed, whereas the defendant accounted for only 5,250,973.

To sustain this contention, the plaintiff relies on several estimates made of the timber, two before and one subsequent to the contract entered into between the plaintiff and defendant.

The views of the trial judge as to these estimates are so well expressed in his written opinion—and in which we fully concur—we take the liberty of quoting the same here:

"In addition to these witnesses, plaintiff has offered in evidence three so-called estimates of the timber in the brake—one by a certain George Peterson, through what purports to be a copy of his estimate attached to the deed of purchase of the property of plaintiff. This so-called estimate shows 24,500,000 feet of sound cypress and 6,000,000 feet of pecky cypress, a total of 30,500,000 feet of cypress in the brake. This copy was admitted over the objection of defendant's counsel to prove rem ipsam merely. It is not shown who Mr. Peterson was, nor is his ability as an estimator of cypress timber established. This statement, therefore, must be disregarded as being of no probative value.

"The next estimate is that of Slack & Collins, who were timber men in the employ of plaintiff, and who were engaged by him to estimate the timber in the brake shortly after his purchase thereof.

"The evidence regarding this estimate is furnished by Mr. Clarence Ellerbe, who was at that time in the employment of plaintiff. From his testimony it appears that both Slack & Collins are dead. The so-called estimate was compiled by young clerks in the office of Mr. Ellerbe, from data supplied by Slack & Collins. It was shown that Collins was a Canadian timber estimator, who had been in this country

a number of years. He was an expert pine estimator, but it is not shown that he had any experience in estimating cypress. Mr. Slack was from Arkansas, and had estimated both pine and hardwood timber, including cypress.

"The compilation of Mr. Ellerbe's young clerks of the data furnished by Slack & Collins shows an estimate of 27,029,622 feet of cypress timber in the brake, more than 3,000,000 feet less than the so-called Peterson estimate.

"The third estimate produced by plaintiff was that of Grimmett & Walker. This estimate was made after all of the timber had been cut and removed from the brake. Grimmett admits that he never estimated cypress timber before, and did not know much about it. His experience was in pine timber. Walker had had some experience in cypress timber operation, but had never before estimated cypress timber after it was cut. In this so-called estimate no allowance was made for peck.

"Walker further testified that the timber should not be cut higher than 18 inches from the ground, and it was on this basis he made this estimate; notwithstanding this statement, he further says that timber could not be cut under the water. The evidence in the case establishes the fact that there was always water in the brake, varying from 3 to 7 feet. Under the contract, defendant was required to cut the timber as its workers went along, and was further required to continue the operations until the timber was removed.

"In view of the manner in which these so-called estimates were made, the discrepancies existing therein, and the uncertainty touching the ability of the parties making them, I am unable to give them the value and accord them the reliability contended for by plaintiff."

As stated, the cypress brake for a large part of the time was covered by water, which necessitated the cutting of the trees higher from the ground than would have been done if there had been no water, and this amount of timber left in the stump was included in Walker's estimate. There was also included in the estimate the tops of the trees from which the logs had been cut, and which it is contended should have been made into lumber.

There is also included in the estimate something over 1,000,000 feet which had to be cut and removed from the right of way to build the tram in order to get the timber to the mill.

Walker says, in his testimony, that in making his estimate he found that many of the tops of the trees had floated away or had been moved out of position, and it was therefore impossible to get the exact length of the tree accurately; in fact, he says that he could not get the length at all, so that he had to get the length in all such cases by taking the average top diameter of all the trees he found, and applying that measurement to those he was unable to find. This, he says, was the only way he could make the estimate.

These facts are mentioned merely to show the great probability of an inflated estimate, and its patent unreliability to serve as a basis to sustain such a large claim as is made against the defendant.

We have carefully considered the entire evidence in the record and our conclusion is that the plaintiff has failed to sustain his demand.

[2] The evidence relied on is wholly insufficient to justify the court in holding that the defendant, either deliberately and fraudulently wasted and destroyed, or failed and neglected, under the terms of his contract, to manufacture into lumber cypress timber in an amount nearly equal to the amount which was manufactured, and gum timber in an amount double that which was made into lumber.

For the reasons assigned, the judgment appealed from is affirmed.

ROGERS, J., recused.